IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

EQUAL EMPLOYMENT OPPORTUNITY
COMMISISON,

                Plaintiff,

vs.                                                                          CIV-03-991 JC/WDS

PVNF, L.L.C., d/b/a Chuck Daggett Motors and
Big Valley Auto,

                Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came on for trial May 5, 2005 through May 9, 2005 before a jury and the Honorable John Edwards Conway, Senior United States District Judge. On May 9, 2005, at the close of Plaintiff's case-in-chief, Defendant moved the Court for renewed Judgment as a Matter of Law on all Plaintiff's claims pursuant to Rule 50 of the Federal Rules of Civil Procedure. I granted Defendant's motion. In accordance with my oral ruling on the record at trial, I now enter the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Ms. Segovia was hired by Teague-Strebeck Motors, PVNF's predecessor corporation, as a car salesperson in November of 1996. Ms. Segovia continued to be employed at the dealership, through a change in ownership, until October 2001.

2. At the time she was hired, Ms. Segovia read, signed and understood a "No Harassment Policy/Procedure" pursuant to which employees were required to make their complaints of harassment known to their supervisor and beyond, if necessary.

3. In January 1997, Ms. Segovia received an "Employee Warning Notice," which placed her

on probation.

4. In or around January of 2000, Ms. Segovia was promoted to the position of Finance Manager.

5. Sometime between January 2000 and July 2000, Ms. Segovia was promoted to the position of Finance Manager by Chuck Daggett, the General Manager of Teague-Strebeck Motors.

6. A Finance Manager is a member of management who participates in management meetings.

7. While serving as Finance Manager, Ms. Segovia had a disagreement with another employee, Brad Daggett, and walked out on the job. Ms. Segovia returned to work after she was asked to come back.

8. In June 2001 Ms. Segovia was again promoted by Chuck Daggett and became New Car Manager.

9. While serving as New Car Manager, Ms. Segovia enjoyed greater compensation than any other member of management except Chuck Daggett.

10. During the time that Ms. Segovia was New Car Manager, Rodney Ennis served as Used Car Manager.

11. Ms. Segovia and Mr. Ennis had an ongoing conflict arising from the nature of their respective compensation arrangements; Ms. Segovia had incentive to place high values on trade-in vehicles to facilitate sales of new vehicles, while Mr. Ennis stood to benefit from lower trade-in values which would facilitate sales of the used vehicles from his lot.

12. The aforementioned conflict erupted in early September 2001, when Ms. Segovia and Mr. Ennis had a confrontation over a trade-in value. During that heated conversation, Mr. Ennis, in response to what he perceived as a snide remark from Ms. Segovia, said "fuck you, bitch" to Ms. Segovia, simultaneously raising his middle finger to her.

13. In response to Mr. Ennis' inappropriate remark and gesture, Ms. Segovia walked away.

14. While Ms. Segovia was walking away, Alva Carter called after her that she should stay in the conversation if she wanted to keep her job.

15. Ignoring Mr. Carter, Ms. Segovia continued to walk away. Mr. Carter then approached Ms. Segovia and asked her to get back to work. Ms. Segovia did not lose her job as a result of walking away from the conversation in which Mr. Ennis cursed at her in front of

      Alva Carter, nor was Ennis formally reprimanded for cursing at Segovia in front of Mr. Carter.

16. Alva Carter regularly threatened both male and female employees with replacement by farm hands.

17. At one point during her employment, Ms. Segovia discussed with Chuck Daggett a comment made by Alva Carter in which Mr. Carter expressed a belief that male customers prefer to deal with male salespersons. Mr. Daggett advised Ms. Segovia that perhaps she should go to the EEOC, as she had considered doing. Ms. Segovia did not discuss Mr. Carter's behavior with any person from the EEOC until after she resigned her employment.

18. On one occasion when Ms. Segovia's husband was present in the dealership, Mr. Carter made a remark to the effect that Segovia's husband would get a good deal on a new vehicle by virtue of being intimate with the manager, his wife.

19. On or about September 5, 2001, Ms. Segovia accessed the password-protected personal email account of Chuck Daggett in order to erase an email she regretted sending to him. While Ms. Segovia was accessing Mr. Daggett's personal email without his permission, she saw and read an email exchange between a salesman in new cars named Smith and Mr. Ennis. Ms. Segovia was the subject of the email, which discussed Segovia's "nasty crotch" being exposed to customers because her skirt was short and referred to her as a"bitch."

20. The derogatory email had been forwarded to Chuck Daggett but Daggett had not seen it.

21. On the day the aforementioned email was written, a problem between Smith and Segovia had arisen; Segovia had embarrassed Smith by sliding magazines under the bathroom door while Smith occupied the bathroom and customers were waiting to see a salesperson.

22. As a manager, Ms. Segovia enjoyed the discretion to "write-up" an employee whose conduct was improper.

23. As part of an overall salary reduction effort, and in order to equalize the pay between the New and Used Car Manager, Ms. Segovia and Mr. Ennis received a new pay plan on October 3, 2001.

24. Ms. Segovia received her copy of the New Pay Plan in an envelope, which envelope also contained a written Warning Notice pertaining to her chronic lateness and complaints from salespeople of her general lack of availability to them. The Notice requested that Ms. Segovia correct the behavior.

3

25. Ms. Segovia presumed that the new pay plan would affect her adversely, though she did not review the plan thoroughly before reaching her conclusion.

26. Upon receipt of the documents, Ms. Segovia threw the Warning Notice on Chuck Daggett's desk and told him it was unacceptable. After talking with a friend of hers at the dealership, Ms. Segovia returned to Mr. Daggett's office and resigned from her job.

27. The person who occupied Ms. Segovia's New Car Manager position after she left was a male and he was subject to the new pay plan. The plan remained in force until after Mr. Ennis left the dealership.

28. Shortly after resigning, Ms. Segovia expressed a desire to return to Defendant dealership in a capacity other than New Car Manager.

29. After Ms. Segovia left Defendant dealership, she was offered a Finance Manager position with another dealership and declined the position.

30. Ms. Segovia testified at trial that she left her employment with Defendant because she realized her children were her first priority and that her job "wasn't worth it" anymore.

## CONCLUSIONS OF LAW

1. Ms. Segovia failed to establish that she was the object of harassment because of her gender.

2. Taking any comments made by Mr. Carter in the context of Ms. Segovia having been consistently promoted, ultimately to the second highest compensated manager at the dealership, it cannot be inferred that any of the comments Segovia attributes to Alva Carter interfered with her work performance.

3. Mr. Carter's comments pertaining to replacing his workers with farmhands were not gender-based.

4. The fact that Mr. Ennis was not formally reprimanded for calling Segovia a "bitch" is insufficient to establish gender bias.

5. The derogatory email about Ms. Segovia that makes reference to Segovia's "nasty crotch," though appalling in its vulgarity and understandably disturbing for Segovia to read, is insufficient to establish the requisite severity and pervasiveness sufficient to support a hostile work environment claim.

6. Ms. Segovia voluntarily left her employment with Defendant and insufficient evidence was presented to support Segovia's claims under theories of constructive discharge or

4

retaliation. Ms. Segovia did not establish that any reasonable person in Segovia's position would have felt compelled to resign and her subjective views are irrelevant to the objective inquiry. Segovia's own statement that she quit her job because it wasn't worth it anymore and her children came first further undermines any contention that she was constructively discharged.

7. Neither the New Pay Plan nor the Warning Notice was shown to have a discriminatory purpose or effect, nor did the evidence presented pertaining to either document support a retaliation claim. Moreover, Ms. Segovia did not attempt to take any steps short of resignation to resolve her issues with the New Pay Plan or Warning Notice.

8. Ms. Segovia's admitted desire to return to work for Defendant eviscerates her contention that the workplace was intolerable.

9. There is no legally sufficient basis for a reasonable jury to find for Plaintiff on any claim presented; thus, Judgment as a matter of law is granted in favor of Defendant and against Plaintiff on all claims pursuant to Rule 50 of the Federal Rules of Civil Procedure.

Dated June 29, 2005.

_____
SENIOR UNITED STATES DISTRICT JUDGE

Counsel for Plaintiff:

    Loretta Medina, Esq.
    Veronica A. Molina, Esq.
    Equal Employment Opportunity Commission
    Albuquerque, New Mexico

    Mary Jo O'Neill, Esq.
    C. Emanuel Smith, Esq.
    Equal Employment Opportunity Commission
    Phoenix, Arizona

Counsel for Defendant:

    Linda G. Hemphill, Esq.
    Stephanie Fuchs, Esq.
    Linda G. Hemphill, P.C.
    Santa Fe, New Mexico